PAUL R. ARNOLD, II *v.* JOHN K. PARRY, EXECUTOR OF THE ESTATE OF WILLIAM P. LAMB, DECEASED AND THE SALVATION ARMY, INC.

[No. 2-975A242. Filed June 13, 1977.]

Larry R. Champion, of Indianapolis, for appellant.

Subrick T. Kothe, Kothe, Shotwell, Claycombe, Hendrickson & Kortepeter, of Indianapolis, Kirkwood Yockey, Yockey & Yockey, of Indianapolis, for appellees.

## CASE SUMMARY

BUCHANAN, P.J.—Paul R. Arnold II, Plaintiff-Appellant (Arnold), appeals from an unfavorable judgment in his attempt to contest the validity of a Will dated July 6, 1970, claiming it was unduly executed, one of his tendered instructions should not have been refused, the Will was procured by undue influence, and the Testator was of unsound mind.

We affirm.

## FACTS

The facts most favorable to the judgment are:

From 1968 until his death in 1974, the Testator, William P. Lamb, resided in Hoosier Village Nursing Home, Marion County, Indiana.

He was visited there frequently by his friend and attorney, Grier Shotwell.

On July 6, 1970, Mr. Lamb executed a Will which was witnessed by Mr. Shotwell and Mrs. Hilda Johnson, the administrator of Hoosier Village Nursing Home. This will left the bulk of Mr. Lamb's estate to The Salvation Army, Inc. (one of the defendant-appellees, the other one being John K. Parry, Executor of Mr. Lamb' estate).

Mrs. Johnson, the only living witness to the Will, stated that Mr. Lamb signed the document in her presence and that she and Mr. Shotwell signed in the presence of each other and Mr. Lamb, and that either Mr. Lamb or Mr. Shotwell

(in Mr. Lamb's presence) referred to the document as Mr. Lamb's Will. She further testified that she did not read the attestation clause above her signature.

Although Mr. Lamb suffered from arteriosclerotic heart disease and various other minor infirmities attributable to old age, he was remarkably alert for his age and continued to be keenly interested in his business affairs until his death in 1974 at the age of 101.

On February 13, 1974, the Will dated July 6, 1970, was admitted to Probate. Arnold, a great-nephew of Mr. Lamb's deceased wife and a beneficiary under a prior Will, filed an action May 21, 1974, to test the validity of that Will.

The Probate Court sustained a Motion for Judgment on the Evidence by Defendants (Parry, as Executor, and The Salvation Army, Inc.) on the issue of undue influence, and the jury returned a verdict for them on the other issues. The verdict was reduced to the following judgment:

"The jury having returned its verdict for the defendants and sustaining the probate of deceased Will, the Court now enters judgment for the defendants, costs versus Plaintiff."

This is an appeal from that judgment.

## ISSUES

Arnold presents four issues for review:[1]

ISSUE ONE: Was the Will dated July 6,. 1970, properly published by the Testator (Lamb) as required by IC 29-1-5-3?

1. Defendants in their brief claim by way of cross-error, that the trial court erred in not granting them judgment on the evidence at the end of plaintiff's case, because Arnold had not established that he was an interested party as required by IC 29-1-7-17.

Trial Rule 59(D) has recently been interpreted to require cross-errors be filed within fifteen days after the service upon appellee of appellant's Motion to Correct Errors regardless of whether the Motion to Correct Errors was based on evidence outside the record. Therefore, Defendants have waived their right to assert as error the overruling of their motion for judgment on the evidence by failing to timely file assignment of cross-errors. *P-M Gas & Wash Co., Inc.* v. *Smith* (1976), Ind. App., 352 N.E.2d 91.

Even if retroactive effect is not given to this interpretation of TR. 59(D), Defendants are not harmed as we affirm.

ISSUE TWO: Whether the court erred in refusing to give Arnold's Preliminary Instruction No. 1.

ISSUE THREE: Whether the court erred in granting Defendant's Motion for Judgment on the Evidence on the issue of the undue influence exerted on the Testator (Lamb) by his attorney (Shotwell).

ISSUE FOUR: Whether the decision was contrary to the evidence on the issue of whether Lamb was of unsound mind at the time the Will was executed.

PARTIES' CONTENTIONS—As to Issue One, Arnold says the Will was improperly executed, because the only surviving attesting witness, Mrs. Hilda Johnson, could not positively state that the Testator published his Will by signifying to her that she was witnessing his signature on his Will as required by IC 29-1-5-3:

29-1-5-3 Signatures

Sec. 3. (a) The execution of a will, other than a nuncupative will, must be by the signature of the testator and of a [sic] least two (2) witnesses as follows:

(1) *The testator shall signify to the attesting witnesses that the instrument is his will* and either

(i) Himself sign, or

(ii) Acknowledge his signature already made, or

(iii) At his direction and in his presence have someone else sign his name for him, and

(iv) In any of the above cases the act must be done in the presence of two (2) or more attesting witnesses. (emphasis supplied)

(the Statute herein)

Defendants (Parry, Executor, and The Salvation Army, Inc.), on the other hand, point out that it can be inferred from Mrs. Johnson's testimony that either Mr. Lamb or his attorney in the presence of Mr. Lamb stated to her that

the document was Mr. Lamb's Will and that this is sufficient publication.[2]

As to ISSUE TWO, Arnold asserts that the court's failure to give his Preliminary Instruction No. 1 caused the jury to be improperly informed on the burden of proof and caused them to give undue weight to the document being presented for probate.

Defendants take the position that the jury was properly instructed on burden of proof and that Arnold's Preliminary Instruction No. 1 would have been unduly confusing to the jury.

As to ISSUE THREE, Arnold argues that a judgment on the evidence on the issue of undue influence was improper, because there was sufficient evidence of undue influence to let the issue go to the jury.

Defendants' response is that there was no evidence of undue influence and that judgment on the evidence was appropriate.

As to ISSUE FOUR, Arnold alleges that the decision was contrary to the evidence because he proved that Lamb was of unsound mind at the time the Will was executed.

Defendants, however, point out that Arnold had the burden of proof on the issue of the Testator's testamentary capacity. They therefore contend that because the evidence was conflicting on the issue of Testator's soundness of mind, and this court cannot weigh the evidence, a finding for them on this issue is necessary.

---

2. Defendants also claim that the presence of an attestation clause in proper form should be prima facie proof of publication. However, the only surviving witness (Johnson) testified that she had not read the attestation clause. An attestation clause which is not read to or by the witnesses is not sufficient publication. *See,* 2 W. Bowe & D. Parker, Page on the Law of Wills, § 19.145 (1960) (hereinafter Page on the Law of Wills), and cases cited therein.

## DECISION

ISSUE ONE

CONCLUSION—It is our opinion that there is sufficient evidence of publication of the Will to comply with the Statute.

Publication is the act of making it known in the presence of witnesses that the instrument to be executed is the Last Will and Testament of the Testator. PAGE ON THE LAW OF WILLS, *supra*, § 19.143. The purpose of publication is not to inform the witnesses that the document is a Will, but rather to make sure that the witnesses are aware the Testator knows he is about to execute a Will. The likelihood of fraud is lessened if the witnesses know the Testator understands the testamentary character of the instrument he is about to execute. 94 C.J.S. *Wills* § 187 (1956).

The pertinent part of the Statute is Sec. 3(a)(1) which provides unambiguously that "The Testator shall signify to the attesting witnesses that the instrument is his Will and either . . ." So a Will is published if the Testator signifies to the attesting witnesses it is his Will.

How may this be done? Must the "sign" come only from the Testator as an utterance from him, as Arnold maintains?

With no Indiana law available to enlighten us, we seek guidance (1) by way of analogy to the requirement of a request by the Testator to the witnesses to sign and (2) the treatment of the publication question in foreign jurisdictions.

The publication requirement seems to be closely analagous to the requirement in some jurisdictions that a Testator request the witnesses to sign.

An Indiana court in *Bundy* v. *McKnight* (1874), 48 Ind. 502, points out that states having a statutory requirement that the Testator request the witnesses to sign do not require that the request come directly from the Testator:

It will be observed, that the . . . section does not require that the witnesses shall attest and subscribe the will at the request of the testator. In that respect it differs from the New York statute, for that in express terms requires that the witnesses must attest and subscribe the will at the request of the testator, and this should be borne in mind when we come to consider some New York cases placing a construction upon such statute.

In *Gilbert* v. *Knox*, 52 N.Y. 125, it is said: ". . . But a substantial compliance is sufficient, and although the statute declares that the witnesses must sign at the request of the testator, and that he shall subscribe the will, or acknowledge the subscription in their presence, *the words of request or acknowledgment may proceed from another, and will be regarded as those of the testator where the circumstances show that he adopted them,* and that the party using them in his presence was acting for him with his assent." 48 Ind. at 506-07. (emphasis supplied)

The request for the witnesses to sign may come from the Testator's attorney or the scrivener of the Will, and is justified as coming from the Testator on an agency theory. The soundness of this doctrine is articulated in *Re Adams* (1922), 120 Wash. 189, 206 P. 947:

*[T]he request that witnesses should attest and subscribe a will may be inferred from the acts and conduct of the testator* as well as from his express words; that the law regards substance rather than literal form in such matters; and that it was not essential that the testator should expressly request the subscribing witness to attest his will; saying, further, that the active part of procuring the witnesses and requesting them to sign the will as such is not infrequently borne by the testator's professional counsel, and that, if such conscious presence and with his apparent consent, the legal effect is the same as though the testator himself had made the request. The soundness of this doctrine is not to be doubted. The ordinary testator does not usually know the statutory requirements necessary to a valid will. It is for this reason that he employs professional counsel. His desire is to make a valid will, and he expects and has the right to presume that his counsel will take all the necessary formal steps the legal execution of the will requires. *His counsel is therefore his representative and agent,* and whatever he does in the line of his employment is conclusively presumed to be done on behalf of his princi-

pal. 120 Wash. at 193-94, 206 P. at 949. (emphasis supplied) See also Annot.; 125 A.L.R. 414 (1940); 79 Am. Jur.2d *Wills* § 266 (1975).

Again in *Gilbert* v. *Knox* (1873), 52 N.Y. 125, the court recognized the similarity beween the two situations—publication and request to witnesses—and applied the agency rationale to both:

> Denio, C.J., said: "The object of the statute is, that an officious signing by witnesses, without any privity of the testator, should not be recognized as sufficient. Here the agency of Morgan (the draughtsman) being established and known, the understanding of the witnesses that they came forward and signed because the testator desired them to do so, and the understanding of the testator that they came and signed at his instance, was perfect, and the privity which was the purpose of the statute was secured." . . . .
>
> This case, although new in instance, is within the principle of the cases cited. The fact that the instrument in question was the will of the testator was made known to all the parties by the public declaration of Colin, who had charge of its execution. He assumed to act and to speak for the testator, and this agency was consistent with his relation to the testator and the will. The testator made no dissent, and when the witnesses had signed the will he took it into his possession and thereafter retained it. 52 N.Y. at 129-30.

In California the statutory requirement as to publication is that the Testator "declare" to the attesting witnesses that the instrument is his Will. The declaration may come from another with the Testator's authority:[3]

---

3. Such a publication is effective however, only if made in the Testator's *conscious* presence.

"The knowledge that the instrument which the witnesses are called upon to attest is a will must be communicated to them by the testator at the time of his subscription." (Gilbert v. Knox, 52 N.Y., 125 at 128.) It is apparent that, in considering the question whether that was done in the present case, we must bear in mind the testator's condition. When a man is in full health and strength, with all his senses in vigor, whatever is said for him and in his presence, may, properly and without danger, be taken to be his act. The declaration that the instrument is the testator's will, and the request to witnesses to sign, may be made by another, under such circumstances, that they are plainly adopted by the testator and become his acts. But, when a man is feeble, and able to speak but faintly, at the very last of a

The code provides that the testator must, at the time of subscribing or acknowledging the same, declare to the attesting witnesses that the instrument is his will." The declaration may be by words or acts, *it may be done by the testator in person or by some person in his presence and by his authority;* but in some way, and at the time, the witnesses must be informed from the testator that he wishes them to understand that the paper is executed as his will. *Re Fusilier's Estate* (1873), Myricks Prob. 40, 41. (emphasis supplied)

Not all jurisdictions recognizing the validity of publication from one other than the Testator do so on agency grounds. Some find a sufficient publication if it was uttered in the Testator's hearing.

*It was not indispensable that the testator should have himself stated the instrument was his will* and requested Oesterly to sign it. If Morse gave Oesterly that information in the presence and hearing of the testator it was sufficient. The assent of the testator would be inferred in the absence of evidence to the contrary. *King* v. *Westervelt* (1918), 284 Ill. 401, 405, 120 N.E. 241, 242. (emphasis supplied)

New Jersey, which purports to require strict adherence to the requirements of its statute,[4] permits publication to be by one other than the testator:

It is settled law that a testatrix may publish a will by assenting to a statement made in her presence. Such an assent may be made by some act or sign. If the scrivener declared, in the hearing of the testatrix, that the paper was her will and she had then signed it, publication might be inferred. Manners v. Manners (1907), 72 N.J. Eq. 854, 66 A. 583.

Also, in *In Re Petkos' Will* (1959), 54 N.J. Super. 118, 148 A.2d 320, no objective sign was required by the Testator for him to adopt the declaration of another made in his presence that the Will was his Will.

The Court concluded the instrument is published as the Testator's Will if done so in his presence, and he need not

___

sickness which has lasted eleven years, and within a few hours of his death, then it is necessary to examine more carefully what takes place before him. *Heath* v. *Cole* (1878), 15 Hun. 100, 103.
4. *See* 124 Annot., 60 A.L.A.2d 124, 138 (1958).

further assent to it by word or deed. The fact that he does not deny it is his Will is sufficient.[5]

While we agree with this reasoning, we give it a different twist in view of our statutory language requiring the Testator to "signify to the attesting witnesses that the instrument is his Will."

Signification by the Testator could conceivably be many things, even "sound and fury signifying nothing" in the phrase of Shakespeare's Macbeth, but we can limit ourselves to the "sign" occasioned by a Testator who has heard an instrument referred to as his Will and then voluntarily signs it in the presence of witnesses.

The testimony of Mrs. Johnson, the only surviving witness to the execution of Mr. Lamb's Will, was that either Mr. Lamb or his attorney said it was Mr. Lamb's will:

Q. You don't know whether or not Mr. Lamb told you that was his will or codicile [sic] or what it was? I'm talking about Mr. Lamb, not what Mr. Shotwell told you.

A. I really couldn't say. I cannot be certain which one said it. I knew it was his will but I don't really remember which one said it.

* * *

5. It is evident that an able-bodied testator, in full possession of his faculties, who stands by in the immediate presence of a lawyer-scrivener and a prospective witness to the execution of a will, and hears the scrivener tell the witness that the document before them is the testator's last will and testament and that the latter desires him to witness the execution of the instrument, is adopting the declaration of the will as his own act and communicating his publication of it to the witness fully and unequivocally by signing it then and there, and remaining in the presence of the witness while the latter signs it in his turn. In such case, there being nothing else to indicate the contrary, "enough" has been "said or done in the presence of and with the knowledge of the testator to cause the witnesses to understand distinctly that the testator desires them to know that the paper produced is his will which they are to attest as such." In re DuBois' Estate, 9 N.J. Super. 280, 285, 76 A.2d 33, 36. (App. Div. 1950). To require, over and above the foregoing, a nod of the head or a murmur or other objective manifestation by the testator of concurrence as an absolute prerequisite to a legally operative declaration in such circumstances would, in our judgment come close to substituting a fetish for a rule of reason. 54 N.J. Super. at 124, 148 A.2d at 323.

Q. Mrs. Johnson, I want to clarify one matter. When I was asking you questions first I thought you stated that Mr. Lamb did not state to you that was his will and he wanted you to sign it.

A. No, I said I don't remember which one said. I do know that he sent Mr. Shotwell up to get me.

Q. To witness the will?

A. That's right.

Q. You witnessed the will at Mr. Shotwell's request?

A. That's right. Again, I don't remember. I don't remember which one of the two actually said. I fell [sic] absolutely certain that Mr. Lamb knew that he was signing a will.

Q. The question is that you can't remember whether or not Mr. Lamb told you this is my will, I want you to witness my will?

A. To be perfectly honest, I can't remember which one did.

So we conclude that Mr. Lamb's will was sufficiently published because he signified it to be his will by the act of signing it after it had been referred to as his will, thereby fulfilling the purpose of the Statute by making the witnesses aware that Mr. Lamb knew he was signing his will.

To hold otherwise would, in the words of the Court in *In Re Petkos' Will, supra,* substitute "a fetish for a rule of reason."

ISSUE TWO

CONCLUSION—It was not eror for the court to refuse to give Arnold's Preliminary Instruction No. 1.

The refused Instruction reads:

You are instructed that even though a written instrument has been offered to this court for probate, that in itself creates no presumption that the written instrument is in fact a valid will. Even though the plaintiff has the burden of proof to convince you that the written instrument is an invalid will, the plaintiff has no presumptions to overcome.

The purpose of an instruction is to advise the jury of the particular question it is to determine and to inform it as to the law and how to apply the law to the facts as it finds them

to be from the evidence. *Coleman* v. *Chapman* (1966), 139 Ind. App. 385, 220 N.E.2d 285. If an instruction could confuse the jury, it is not error to refuse to give it. *Brewer* v. *State* (1969), 253 Ind. 154, 252 N.E.2d 429.

McCormick in his treatise on evidence calls presumption, "The slipperiest member of the family of legal terms, except its first cousin, 'burden of proof.'"[6] The trial court could have reasonably concluded that an instruction including both terms with no further explanation might confuse and mislead the jury.

Furthermore, there would appear to be no rational basis for a jury of laymen to necessarily assume a presumption exists unless they are so instructed. Thus the failure to instruct that *no* presumption exists could hardly be classed as error.

Because the burden of proof aspect in the refused instruction was adequately covered by other instructions, and because the court could reasonably have concluded the refused instruction was confusing, no error was committed by the trial court. *Frankfort* v. *Owens* (1976), 171 Ind. App. 566, 358 N.E.2d 184; *Brewer* v. *State, supra.*

ISSUE THREE

CONCLUSION—The court did not err in granting Defendants' Motion for Judgment on the Evidence on the issue of undue influence.

Judgment on the evidence may only be affirmed if there is a total absence of evidence or reasonable inferences therefrom in favor of the plaintiff upon the issues in question. If there is any probative evidence or reasonable inference drawn from the evidence, or if evidence is

6. McCormick, Handbook of the Law of Evidence 802-803 (Cleary ed. 1972).

such that the minds of reasonable men might differ, then the judgment on the evidence is improper. *McClure* v. *Austin* (1972), 152 Ind. App. 398, 283 N.E.2d 783. To sustain a judgment for the defendant on the evidence, it must support without conflict, only one inference which is in favor of the defendants, and if there is any evidence allowing reasonable men to differ, a directed verdict should not be entered. *Moster* v. *Bower* (1972), 153 Ind. App. 158, 286 N.E.2d 418.

Undue influence has been defined as the exercise of influence on the Testator in such a way as to procure the execution of a Will by destroying the free agency of the Testator and inducing him to do what was against his will. *Crane* v. *Hensler* (1925), 196 Ind. 341, 141 N.E. 51; *Hinshaw* v. *Hinshaw* (1962), 134 Ind. App. 22, 182 N.E.2d 805. Further, undue influence must be directly connected with execution of the Will and must operate at the time it was executed. *Crane* v. *Hensler, supra; Jarrett* v. *Ellis* (1923), 193 Ind. 687, 141 N.E. 627.

It was incumbent on Arnold to introduce some evidence that such influence was exercised by Mr. Shotwell on Mr. Lamb.

Arnold takes the position that because a long standing friendship and attorney-client relationship existed between Lamb and Shotwell, this is evidence from which a jury could infer the attorney exerted undue influence on his client. A preposterous proposition! And one which would virtually sound the death knell for the valid execution of wills. It might be otherwise if the attorney or a member of his family were a beneficiary under the Will.[7]

---

7. The fact that the will requested the Executor to name Mr. Shotwell as attorney to the estate does not give rise to an inference of undue influence.

[T]he sole fact of the naming of the draftsman as executor and trustee creates no legal presumption of undue influence which imposes a duty of explanation. *Breadheft* v. *Cleveland* (1915), 184 Ind. 130, 133, 108 N.E. 5-6.

If a draftsman named executor creates no presumption of undue influence, a draftsman named attorney to the estate does not.

Nor does Mr. Shotwell's remote connection with The Salvation Army, the major beneficiary under the Will, raise any inference of undue influence. The evidence was that Mr. Shotwell was active in various civic and charitable organizations.

The record is barren of any evidence suggesting that Mr. Shotwell exerted undue influence over his client at the time the Will was executed or at any other time.

ISSUE FOUR

CONCLUSION—Arnold's allegation that the judgment is contrary to the evidence on the issue of whether the Testator was of unsound mind, raises no issue for review.

Arnold had the burden to prove that the Testator was of unsound mind. Therefore his appeal is from a negative judgment and can only be challenged as contrary to law. *Link* v. *Sun Oil Co.* (1974), 160 Ind. App. 310, 312 N.E.2d 126; *Goff* v. *Graham* (1974), 159 Ind. App. 324, 306 N.E.2d 758.

Even if the issue had been properly preserved for appeal, our decision would have been unfavorable to Arnold.

For us to reverse a negative judgment as contrary to law, we must find that the evidence is without conflict and can lead to but one conclusion, and that the jury has reached an opposite conclusion. *Pokraka* v. *Lummus* (1951), 230 Ind. 523, 104 N.E.2d 669; *Carsten* v. *Eickhoff* (1975), 163 Ind. App. 294, 323 N.E.2d 664.

There is ample evidence in the record before us that Mr. Lamb was of sound mind at the time his Will was executed. A number of witnesses testified that he was unusually alert for his age and that he kept himself informed as to his business interests and world affairs.

Though being named as attorney for the estate could be considered a benefit derived from the Will, it is not the Salvation Army made beneficiary. The benefit of being attorney to the estate remains the same regardless of who the beneficiaries are.

In the face of contradictory evidence on the issue of soundness of mind, we support the judgment. *Pokraka* v. *Lummus, supra; Carsten* v. *Eickhoff, supra; Link* v. *Sun Oil Co., supra.*

The judgment of the Probate Court is affirmed.

Sullivan and White, JJ., concur.

NOTE.—Reported at 363 N.E.2d 1055.